# In the United States Court of Federal Claims

No. 21-1273
(Filed: February 27, 2025)

```
* * * * * * * * * * * * * * * * * *
                                  *
BES DESIGN/BUILD, LLC,            *
                                  *
              Plaintiff,          *
                                  *
     v.                           *
                                  *
THE UNITED STATES,                *
                                  *
              Defendant.          *
                                  *
  * * * * * * * * * * * * * * * * *
```

*Jerome E. Speegle*, Speegle, Hoffman, Holman & Holifield, LLC, of Mobile, AL, for Plaintiff.

*Ioana C. Meyer*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, with whom were *Brian M. Boyton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Steven J. Gillingham*, Assistant Director, all of Washington DC, for Defendant, and *Bailey Kapfer*, District Contract Law National Practice Group, Office of General Counsel, Department of Veteran Affairs, of Washington, DC, of counsel.

## ORDER AND OPINION

**SOMERS**, Judge.

This case concerns Plaintiff BES Design/Build LLC's ("BES") claims for delay damages that arose from two contracts it entered into with the Department of Veteran Affairs ("VA"). In 2012, BES and the VA entered into two indefinite-delivery, indefinite-quantity contracts, whereby BES was to provide a series of architectural and engineering design documents to the VA in preparation for the renovation of an existing VA medical center in North Little Rock, Arkansas. Per the contracts, BES was to submit five sets of documents to the VA according to a set timeline. After each submission, the VA was to provide comments that were to be resolved and then incorporated into the next submission. However, expectations quickly began to change in two ways. First, the VA submitted a series of comments requesting that BES include in its designs elements that BES claims were not within the scope of the contract. Second, the VA rejected submissions that did not integrate all of its comments instead of, as BES expected, allowing BES to integrate the VA's comments and feedback into future designs for review at the final submission.

1

BES points to three changes that the VA requested over the course of its submissions that allegedly caused delay and expanded the scope of work agreed to in the original contracts. First, the VA claimed that BES was required to create designs for the demolition and replacement of all existing plumbing and fixtures in the basement bathrooms, which BES had instead designed to be reused. Second, the VA claimed that BES was required to create designs for the replacement of all existing electrical panels. Third, the VA initially requested that BES create designs for the building's heating system to eradicate the steam-powered heating system, in favor of changing to a gas-powered boiler.

Throughout the rounds of comments and submissions, BES forged ahead with its subsequent submissions without incorporating all of the VA's requested changes, given the dispute about whether the changes were contractually required. As the project dragged on over the course of three years, the VA began to reject BES's submissions, and BES resubmitted revised versions, even integrating the changes that it believed to be outside of the scope of the project. The VA continued to pay BES according to its contractual agreement after each submission. Following BES's final submission, the VA refused payment on the final payment application. It also refused to pay any damages for alleged VA caused delays on the project.

Soon thereafter, BES filed a certified claim with the VA, which the VA rejected, and this suit followed. BES has brought three causes of action for breach of contract. The government has moved for summary judgment on all three causes of action. For the reasons that follow, the Court grants in part and denies in part the government's motion for summary judgment.

## BACKGROUND AND PROCEDURAL HISTORY

### A.    Contract Structures and Agreement

On September 19, 2012, BES was awarded two contracts, one for architectural designs (VA256-12-D-0332) and one for engineering designs (VA256-12-D-0333), in preparation for the partial renovation of a vacant VA medical center located in North Little Rock, Arkansas (Health Services Research and Development Building #58). *See* ECF No. 1 ¶¶ 6–7; ECF No. 36 at 2, 6. The contracts were to be performed concurrently over the course of 180 days, beginning on May 6, 2016, when the Notice to Proceed ("NTP") took effect. *See* ECF No. 1-4 at 1; ECF No. 36-9 at 2. According to the project schedule, BES's performance would consist of five submissions to the VA, to be delivered on given dates throughout the 180-day performance period. *See* ECF No. 1-5 at 4.

BES was contracted to provide design services for the subsequent renovation of approximately 26,000 square feet of the building, which is over 43,000 square feet in total. *Id.* at 2. However, the Scope of Work did not specify which of the over 43,000 square feet of the existing building would be the subject of the renovation. That topic first arose in a meeting between BES and the VA on May 18, 2016, twelve days after the NTP took effect. *See* ECF No. 36-4. Following a walk-through of the building, the parties held a meeting. *Id.* In its meeting notes, the VA briefly describes the condition of each floor of the building and the predicted renovation requirements, concluding that "[w]hile certain areas have been identified as needing renovation, *it is [BES's] responsibility to determine which areas make the most sense*

2

*for renovation.*"  *Id.* ¶ 2(G) (emphasis added); *see also id.* ¶ 9.  BES was effectively limited in the scope of its designs by the contractual scope of work, the VA's direction, VA technical guidelines and minimum requirements, and the Estimated Cost of Construction ("ECC"), which had been set at $5.8 million.  *See* ECF No. 36-1 at 42–43; ECF No. 1-2 at 1.

The contracts incorporated by reference several provisions of the Veterans Affairs Acquisition Regulation ("VAAR"), the Federal Acquisition Regulation ("FAR"), and provisions found within the VA's Technical Information Library ("TIL"), such as design manuals, standards, criteria, and space requirements.  *See generally* ECF No. 1-3; *see also* ECF No. 1-5 at 8–9.  One specific guide, found in the VA's TIL, that was incorporated into the contracts was the VA's Program Guide known as PG-18-15, Volume C, which sets out "the minimum requirements for each submission in the production of VA Schematics, Design Development, and Construction Documents for Minor and NRM Construction Program for Medical Center Projects."  ECF No. 36-6 at 3.  The contracts also incorporated a program guide known as PG-18-3, Design and Construction Procedures, which were considered "the minimum acceptable standards for the design and construction of VA facilities," ECF No. 36-5 at 3, as well as PG-18-10, a Plumbing Design Manual, ECF No. 36-65.

BES delivered its first of the five submissions—consisting of a Signature Page with a set of drawings, space criteria, and cost estimates—on June 8, 2016, four days after the contractual deadline of June 4, 2016.[1]  *See* ECF No. 1-2 at 1; ECF No. 36-12.  On June 24, 2016, BES sent the VA a payment application for $69,941.30 for the Signature Page submission, and the VA paid it.  *See* ECF No. 36-64 at 2.  This first, non-substantive submission posed no issue for either party, despite the delay.

| Required Submission | Deadline post-NTP | Contractual Deadline | Submission Date |
| --- | --- | --- | --- |
| Signature Page | 30 days | June 4, 2016 | June 8, 2016 |
| Schematic | 74 days | July 18, 2016 | July 26, 2016 |
| Design Document | 120 days | September 2, 2016 | September 16, 2016 |
| Construction Document | 160 days | October 12, 2016 | December 2, 2016 (and five other undefined dates) |
| Final Document | 180 days | November 1, 2016 | June 2018 (and five other undefined dates) |

---

[1] Throughout the materials cited, the parties refer to the submissions using the terms "10% Design," "35% Design," "65% Design," "95% Design," and "100% Design."  Since the submissions were not cumulative additions to the same materials but rather submissions of different types of the architectural and engineering plans, the names given in the original project schedule will be used for clarity (e.g., "Signature Page submission," "Schematic submission," "Design Document submission," "Construction Document submission," and "Final Document submission").

**B.**      **First Submissions: Signature Page and Schematic**

On July 26, 2016, one month after the Signature Page submission, BES delivered its second submission, the Schematic submission, eight days after the contractual deadline of July 18, 2016. *See* ECF No. 36-13; ECF No. 1-2 at 1; *see also* ECF No. 1 ¶ 13; ECF No. 36 at 11. The Schematic submission included both a design narrative, ECF No. 36-13, and computer-aided design ("CAD") drawings, ECF No. 36-14. The drawings generally identified areas of the building that would be the targets of renovation, but they did not depict the exact nature of the renovation work to be done. *See* ECF No. 36-14. The design narrative had more descriptions of the anticipated renovation work. For example, the design narrative stated: "Demolition work will completely demolish existing plumbing service piping lines no longer in service or service pipe that has become deteriorated with age." ECF No. 36-13 at 36. However, neither the narrative descriptions nor the drawings specify which plumbing lines were "no longer in service" or which plumbing lines had "become deteriorated with age" and thus did not require demolition work. *Id.* at 36. Similarly, although the narrative states "[n]ew [electrical] panels will be provided in the renovated areas as necessary to eliminate panels past their useful life," neither the narrative nor the design identifies which electrical panels are "past their useful life" and which are not. *Id.* at 41. The total ECC at the Schematic submission was $3,703,748.00. *Id.* at 42.

On August 1, 2016, BES sent the VA a payment application for $122,501.29 for the Schematic submission, and the VA paid it. *See* ECF No. 36-64 at 3. Eight days later, on August 9, 2016, representatives from the VA met with BES to discuss the Schematic submission. *See* ECF No. 36-15. In that meeting, the VA addressed changes it hoped to make, such as, that it "[w]ould like to enlarge room 134A and make it an office and make room 134 the data server room, swap the rooms." *Id.* at 5. According to BES's meeting notes, in that meeting, the VA did not bring up any issues regarding the replacement of basement plumbing, electrical panels, or the heating system. *Id.*

BES contends that following a submission, the contracting officer's representative ("COR") should have provided BES with written comments on the submission within the allotted fourteen-day response period and then accepted the designs. BES alleges that it would have resolved those comments in its next submission, rather than resubmitting documents before moving on to the next submission. *See* ECF No. 39 at 4. Instead, sixteen days after the Schematic submission, on August 11, 2016, the COR sent BES his comments on the Schematic submission with a note that he rejected the designs "due to the absence of the items identified on the attached comment sheet." ECF No. 36-16 at 2. The attached comment sheet included thirty comments, such as "[n]o electrical equipment listed or included" and "[e]lectric closets not identified on each floor and not stacked." *Id.* at 4. None of the comments made mention of the plumbing, piping, or heating designs in the Schematic submission.

**C.**      **Third Submission: Design Document Submission**

Next, BES sent the VA the third submission, the Design Document, which comprised several sets of CAD drawings, a design narrative, specifications, a transmittal letter, and responses to the COR's comments on the Schematic submission, on September 16, 2016, fourteen days after the September 2 contractual deadline. *See* ECF No. 36-17 at 3. The nearly

1,900-page Design Document contained three notable attributes. First, the drawings and narrative indicated that the plumbing and certain fixtures in the bathrooms located in the basement of the building would be reused rather than demolished and replaced. *See id.* at 1796, 1852, 1856. Second, the drawings did not show the replacement of all existing electrical panels, opting instead to reuse certain existing, functional panels. *See id.* at 1866. Third, the narrative as well as responses to the Schematic submission comments indicated that the existing steam heat system would be reused to heat the building. *Id.* at 1540–41. The total ECC in the Design Document submission was $3,783,472.00. *Id.* at 1544.

On September 29, 2016, thirteen days after the Design Document submission, the COR emailed BES rejecting the submission, ECF No. 36-21, and attaching a comment sheet with forty-six comments, ECF No. 36-20, like the one emailed on August 11, 2016, in response to the Schematic submission. None of these comments addressed the basement bathroom plumbing or fixtures, the replacement of electrical panels, or the use of steam heat. Nevertheless, the COR stated that he was rejecting the submission because "[m]any key elements are not included in accordance with the TIL. Please refer to Section PG 18-15 volume C." ECF No. 36-21 at 2. In an email on October 16, 2016, BES employees working on the project expressed confusion about the rejections of the Schematic and Design Document submissions, stating that the COR "is strictly using the PG-18-15 checklists in the VA Design Guide and is looking for each and every item listed on that checklist whether it is required or not." ECF No. 36-22 at 2. BES's expectation seemed to be that "review comments are typically provided to the [architect/engineer] so that those items can be picked up and put into the next submission and just because some items are missing or incorrect that is not a reason to reject the submission." *Id.* Despite the second rejection, on October 18, 2016, BES submitted a payment application for its work on the Design Document submission, for $165,346.98, which the COR signed and approved on October 19, 2016, and the VA subsequently paid in full. ECF No. 36-64 at 4.

### D.    Fourth Submission: Construction Document Submission

BES sent its fourth submission, the Construction Document, which consisted of CAD drawings and a design narrative, on November 30, 2016, fifty-one days after the October 12, 2016, contractual deadline. *See* ECF No. 36-24 at 2. By the Construction Document submission, the total square footage of the renovation project had risen from approximately 26,000 square feet to approximately 30,364 square feet, and the ECC had risen to between $5,479,789 and $6,141,078. *See* ECF No. 36-28 at 2, 4. Nine days after the Construction Document submission, on December 9, 2016, the COR emailed BES, this time requesting that BES revise and resubmit the Construction Document after integrating the COR's feedback as contained in the email. *See* ECF No. 36-25 at 3. Following this initial email requesting a revision, the COR sent subsequent sets of comments, *see* ECF No. 36-26, the parties met to discuss the feedback, *see* ECF No. 36-27, and the parties exchanged emails about certain requested changes, *see* ECF No. 36-29; ECF No. 36-30. Amid the emails and comments, and in spite of the request for revision and resubmission, on December 21, 2016, BES submitted a payment application for $148,000.70 for its work on the Construction Document, which the COR signed and approved on December 21, 2016, and the VA subsequently paid in full. ECF No. 36-64 at 5.

With respect to the three notable design attributes present in the Design Document, the Construction Document still reused existing fixtures and plumbing in the basement bathrooms, reused existing, functional electrical panels that were not marked for replacement, and reused the existing steam heat system. The comments from the VA on the Construction Document did not make mention of the basement bathrooms. *See* ECF No. 36-25, ECF No. 36-26. With respect to the electrical panels, the COR commented: "[e]lectrical panels are not properly marked and identified on the panel schedule. Clarify which panels in basement will be used, replaced or demolished." ECF No. 36-25 at 3; *see also id.* at 6, 8, 9; ECF No. 36-26 at 3, 6. However, in response to several specific comments regarding identifying and replacing basement electrical panels, such as "[r]eplace both panels and end of stairwell in basement" and "[n]eed new electrical panels with new panels and feed with 100 amp line on . . . 1B (located in basement). . .," BES replied, "[n]ot in scope." ECF No. 36-26 at 3; *see also* ECF No. 39-2 at 16.

At this juncture the third attribute, the building's use of steam heating, became a central issue between the parties. The COR contacted BES on January 6, 2017, to let BES know that he was "considering a revised scope of work on the Project Renovate B58, HSRD. The main purpose is to remove all steam from the building and replace with a new boiler." ECF No. 36-29 at 4. Although the designs that BES provided until this point indicated removing the use of steam, they did not eliminate the "steam/water exchanger," and, therefore, the VA was hoping to "remove the exchanger and replace it with a gas powered condensing boiler." *Id.* The COR requested a proposal for the additional work, which BES provided on February 17, 2017. *Id.*; *see also* ECF No. 36-30 at 2. Included in that proposal for additional work was a provision for BES to be paid a fee of $180,782.95 for the additional work required. ECF No. 36-30 at 3. Confusion ensued after this exchange, as BES's internal emails indicate that it expected the resubmission of the Construction Document to be "on hold" until the VA submitted a new request for proposal and estimated construction cost. *See* ECF No. 36-31; ECF No. 36-29; ECF No. 36-32. The COR sent an email on February 28, 2017, stating that the VA expected the project to continue according to the originally contracted schedule, despite the contemplated change. ECF No. 36-32.

BES claims that between December 2016 and June 2018 it submitted a total of six versions of the Construction Document in response to the VA's comments, all of which the VA rejected. *See* ECF No. 39-1 at 3. Throughout that time, BES and the COR exchanged regular emails regarding the multiple rounds of resubmissions of, and comments on, the Construction Document. *See, e.g.,* ECF No. 36-29; ECF No. 36-30; ECF No. 36-31; ECF No. 36-32; ECF No. 36-33; ECF No. 36-34; ECF No. 36-35; ECF No. 36-36; ECF No. 36-37; ECF No. 36-40; ECF No. 36-41. BES states that it continued working throughout the entire period to respond to the VA's comments, *see* ECF No. 39 at 11, including hiring a contractor to help trace electrical circuits for replacement that it had not previously understood to be within the scope of the project. *See* ECF No. 36-39; ECF No. 39-1 ¶ 20.

E.    **Fifth Submission: Final Document Submission**

In June 2018, BES submitted the fifth and final submission, the Final Document. *See* ECF No. 36-42. It was not until six months later, on January 28, 2019, that the VA responded with comments to both the Construction Document and the Final Document. ECF No. 36-43.

6

The VA's the comments address the three notable attributes in the Schematic and Design Document submissions. Regarding the plumbing, one of the VA's notes about the basement plumbing demolition drawing reads "[r]eplace piping in walls. Piping, valves and clean outs need replacement. Recirculating needs to go to fixture." *Id.* at 3. In response, BES wrote "[e]xisting budget will not permit replacing existing piping. Extensive Demolition of finishes will be required. Existing recirculating lines are reused." *Id.* With respect to the electrical panels, one comment by the VA about the electrical drawings reads "[p]anels around stairwell must be replaced"; in response, BES wrote "[p]anels are not in scope." *Id.* at 2. Another VA comment reads "[p]anels need replacement" above a list of fifteen panels, to which BES replies "[p]anels are not in scope." *Id.* The total ECC in the final cost estimate came to $6,610,995.00. ECF No. 36-59 at 41.

On May 21, 2019, BES submitted a payment application for its work on the Final Document for $48,234.29, which the COR approved on May 24, 2019, and which the VA paid in full. *See* ECF No. 36-64 at 6. One month later, on June 19, 2019, BES and the VA met to discuss the submissions. *See* ECF No. 36-45. In that meeting, BES wrote "[a]ll electrical panels that shall be replaced or demolished have been identified." *Id.* at 3. By September 2019, BES had resubmitted the design twice, along with a payment application for $17,370 for its work on the resubmissions, which the COR did not approve on the basis that the submission was incomplete. *See* ECF No. 36-49 at 2 ("Your package that was submitted to Engineering (John Knight) for review was not complete and upon review missing the following: Never received commissioning data/report, schedule to state time line [sic] to complete work, and did not respond to all previous design comments. Your invoice at this time is not approved.").

In late September, the VA and BES communicated over email and telephone regarding feedback on the Final Design submission. *See* ECF No. 36-50. On September 27, 2019, BES emailed the COR about a conversation in which the COR told BES that "existing bathrooms and fixtures should be demolished and replaced in our contract documents." *Id.* at 2. BES emailed the COR because it believed that the replacement of functional fixtures and plumbing was not within the original scope of work and requested either a change order or documentation proving that it was within the original scope. *Id.* at 3. The COR replied that the work was in the scope of what a BES representative had conceded was within the scope of work during a visit and, moreover, that this was within the scope of work contained in the original contracts. *Id.* at 6. One month later, on October 25, 2019, BES submitted a revised Final Document, which the VA rejected as incomplete several days later. *See* ECF No. 36-51. Several weeks later, in November 2019, BES submitted another payment application for $24,144.93 for its work on the resubmission, which the COR did not approve and which the VA did not pay. *See* ECF No. 36-48.

On November 22, 2019, the VA issued a Notice to Cure in which it detailed the comments that BES had failed to address in its resubmissions of the Final Design. *See* ECF No. 36-53. Therein, the COR states "[t]wo basement restrooms and all fixtures require replacement. Drawings still show restrooms and fixtures remain." *Id.* at 4. It also requests designs and costs for the replacement of a list of electrical panels. *Id.* at 3. Importantly, it notes that "[c]ontractor estimate for construction was provided at over one million [dollars] more tha[n] previous estimates with no explanation." *Id.* Following an extension provided by the VA,

BES resubmitted its Final Design on December 2, 2019.  ECF No. 36-56.  For the Final Document submission, which included demolition of the basement restrooms and replacement of the existing electrical panels, BES stated that the total cost estimate for the project came to $6,610,995.00.  *Id.* at 41.  The VA rejected the design on January 2, 2020.  *See* ECF No. 36-57.

**F.    Certified Claim**

BES submitted a certified claim to the VA on February 10, 2020, in the amount of $198,386.63 for "government-caused delay, out-of-scope changes requested by the government, the government's rejections of BES design submissions, as well as alleged travel, labor, and material costs incurred by BES as a result of the government's rejected design submissions."  *See* ECF No. 1-1 at 1.  BES alleged that the VA caused 1,351 days of delay because it increased the scope of work.  *Id.* at 7–9.  The claim makes no mention whatsoever of the contemplated change away from steam heating that occurred in 2017.  The COR denied the claim on April 24, 2020. *Id.*

BES proceeded to resubmit the Final Document in May and July of 2020.  *See* ECF No. 36-59, ECF No. 36-61.  On April 22, 2021, BES filed its complaint with this Court seeking $198,486.63 in damages based on three causes of action related to the government's breach of contract.  *See* ECF No. 1.  The government answered on September 24, 2021.  ECF No. 9.  The government moved for summary judgment on March 29, 2024.  ECF No. 36.  The Court ordered briefing and held oral argument on September 17, 2024.  ECF No. 39; ECF No. 40; ECF No. 31.

## DISCUSSION

**A.    Legal Standards**

**1.    Summary Judgment**

Rule 56(a) of the Rules of the U.S. Court of Federal Claims ("RCFC") establishes that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original) (discussing FED. R. CIV. P. 56(c)).

Material facts are defined as facts that "might affect the outcome of the suit under the governing law . . . ."  *Id*. at 248.  Not only must a fact be material, but the dispute over that fact must be genuine, meaning the evidence must be "such that a reasonable [fact finder] could return a verdict for the nonmoving party."  *Id*.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute." RCFC 56(c)(1)(A), (B).  When faced with a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.  RCFC 56(c) describes the types of evidence that a movant may use to support its motion, such as

"depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials." Similarly, a non-moving party need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment," but it may oppose a motion using "any of the kinds of evidentiary materials listed in [the rule], except the mere pleadings themselves . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

With respect to the burden, the movant "always bears the initial responsibility of informing the . . . court of the basis for its motion." *Celotex*, 477 U.S. at 323 (citing FED. R. CIV. P. 56(c)). By contrast, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" making summary judgment appropriate. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

### 2.    Subject Matter Jurisdiction

This Court may hear claims arising under the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 7101–7109, over claims that arise out of an "express or implied contract . . . made by an executive agency for . . . the procurement of services . . . [or] the procurement of construction, alteration, repair, or maintenance of real property." 41 U.S.C. § 7102(a)(2), (3); 41 U.S.C. § 7104(b). A claim is defined as a "written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract." 48 C.F.R. § 52.233-1(c). Although a claim need not be in any particular form or use any particular wording, it must contain "a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." *Cont. Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1987). This Court's jurisdiction over a claim is proper if the contractor submitted a valid claim to the contracting officer, received his or her final decision, and if the contractor brings an action within twelve months of the date of receipt of that decision. 41 U.S.C. § 7104(b); *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010).

### B.    Analysis

BES alleges three causes of action for breach of contract that it claims entitle it to equitable adjustment. ECF No. 1. To establish entitlement, BES must prove "liability, causation, and resultant injury." *Servidone Constr. Corp. v. United States*, 931 F.2d 860, 861 (Fed. Cir. 1991). In turn, BES may establish liability by proving that the VA made constructive changes to the contract. *See Redland Co., Inc. v. United States*, 97 Fed. Cl. 736, 755 (2011). A constructive change amounts to any "work performed outside of the scope of the contract." *Miller Elevator Co., Inc. v. United States*, 30 Fed. Cl. 662, 678 (1994).

1.      There Are Genuine Disputes of Material Fact as to Whether the Government
        Made Constructive Changes to the Contracts.

BES alleges that the government imposed three design changes—to designs for basement plumbing and fixtures, for the electrical panels, and for the heating system—that caused delay, required a change order, and merit compensation.  ECF No. 1 ¶¶ 18, 22.  The government counters that these three design changes were within the scope of the original contract and thus did not constitute constructive changes.  ECF No. 36 at 31.  With respect to the first two changes, the government fails to make the requisite showing under RCFC 56(a), and there remains a genuine dispute of material fact as to whether the two design changes were within "the scope of the contract."  *Miller Elevator Co.*, 30 Fed. Cl. at 678.  For the third change, with respect to the heating system, BES has failed to show that the Court has jurisdiction over the claim because BES is unable to demonstrate that it submitted a claim to the contracting officer related to the heating system.

The dispute about the first two constructive changes at issue—the basement plumbing and electrical panels—turns on a central question: which facets of the existing building did the contracts require BES to include in its designs?  Although the parties agreed that the designs should reflect that "[d]emolition work will completely demolish existing plumbing service piping lines no longer in service or service pipe that has become deteriorated with age," they did not agree on *which* plumbing lines were no longer in service, *which* pipes had become deteriorated with age and, therefore, *which* pipes had to be marked for demolition and replacement in the designs.  ECF No. 36-13 at 36.  And while they agreed that the designs should reflect that "new [electrical] panels will be provided in the renovated areas to eliminate panels past their useful life," they did not agree on *which* panels were past their useful life and, therefore, *which* panels had to be marked for removal and replacement in the designs.  *Id*. at 41.  The government attempts to read the contract to mean *all* pipes and *all* electrical panels required replacement, but it cannot point to any part of the contractual documents that states as much.  ECF No. 36 at 25, 26.

The government's assertion that the "VA made no scope changes to the contract, and thus BES is not entitled to any delay based on alleged damages" is a disputed material fact, because the government failed to demonstrate that the contractual language can only mean that *all* the plumbing and electric panels had to be included for replacement in BES's designs.  *Id*. at 31.  The government repeatedly argues that its interpretation is "*explicitly* required" based on the agreement that BES was to "develop design drawings for civil, architectural, mechanical, electrical, fire protection, IT, and all other facility required systems."[2]  *Id*. at 26 (quoting ECF No. 36-3 at 3, referred to as "Supplement B").  This broad list of requirements does not foreclose BES's interpretation.  Moreover, nowhere in its ten pages of briefing on this subject does the government identify any other provision of the contracts or corresponding technical guide pages that mandate such a reading.  *Id*. at 24–29; ECF No. 40 at 5–9.  BES's contrary reading of the same contracts—supported by the absence of specific language in the contracts creating such a

---

[2] Statements that the government claims are explicit and unambiguous from the documents it draws from seem not to be present on the page, both figuratively and literally.  Indeed, each of the government's citations is incorrect by at least one page (sometimes by even more than a page) both in its briefing and in its citations at oral argument.  ECF No. 43 at 24:12–25:24.

requirement, the lack of need to replace the existing plumbing and electrical panels that still had useful life, the discretion afforded to BES as architects and engineers to make logical design choices, and the budget given for the project—creates a genuine dispute of material fact. ECF No. 39 at 8. The Court addresses why this is true for each of the two alleged changes in turn.

> a. **The government failed to show that the contracts required BES's designs to demolish functional plumbing fixtures in the basement.**

In three of four of its substantive submissions, BES designed the basement bathrooms to reuse plumbing fixtures, such as toilets and sinks, that were already in the building and functional, as well as to reuse existing and functional pipes that serviced those fixtures. *See* ECF No. 36-14; ECF No. 36-18; ECF No. 36-24. As the CEO and President of BES states in his affidavit in opposition to summary judgment, the "existing plumbing was adequate and had not outlived its usefulness," it "was not cost effective and it was not necessary" to replace the fixtures and pipes, and in fact the "cost of doing this would cause the design to exceed the [ECC]." ECF No. 39-1 ¶ 12. This statement is borne out by the evidence, as the ECC jumped dramatically to well above the contractual cost of $5.8 million, in part because BES ultimately changed its designs to include the demolition and replacement of the plumbing and fixtures in the basement bathrooms in its Final Design. *Compare* ECF No. 36-13 at 42 (estimating an ECC of $3,703,748.00), *with* ECF No. 36-59 at 41 (estimating an ECC of $6,610,995.00). To BES, the demolition and replacement of working bathroom fixtures and plumbing was not only not required by the language of the contracts it had with the VA, but it also did not make sense to do so based on the scope of the project and the ECC. *See* ECF No. 39 at 10.

By contrast, the government makes two arguments that the contracts required BES to design plans for the demolition and replacement of existing, functional plumbing fixtures and pipes in the basement bathrooms rather than for their reuse: 1) that the contracts explicitly required this under Supplement B and PG-18-15, ECF No. 36 at 24–25; and 2) that the contracts implicitly required this, because PG-18-10 mandates that designs eradicate all "dead ends," or abandoned plumbing lines, *id.* at 25, 9. Although the Court agrees that "the determination of what is included in the contract is a contract interpretation issue, which 'begins with the language of the written agreement,'" the language of the contracts does not clearly support the government's argument. ECF No. 36 at 24.

Turning to the first argument, the government's position rests on a strained reading of the contractual documents. It most of its briefing, the government cites two specific provisions: a list of categories of design drawings BES was responsible for, which is found in Supplement B ("The [architect/engineer] will develop design drawings for civil, architectural, mechanical, electrical, fire protection, IT, and all other facility required systems"), ECF No. 36-3 at 3 (cited in ECF No. 36 at 25); and PG-18-15, which provides a list of the minimum requirements of the narrative and drawings, including identifying "existing plumbing systems to be used and necessary modifications," ECF No. 36-6 at 24 (cited in ECF No. 36 at 25). However, neither Supplement B nor PG-18-15 require the demolition and replacement of existing, usable bathroom fixtures and pipes. More concerningly, in certain parts of its brief, the government fails to offer any support whatsoever for the assertion that "the contract documents . . . already included [this] requirement." *Id.* at 26 (no citation). Based on two documents that do not

11

mention the words "reuse" or even address required demolition with respect to plumbing, and based on blanket, unsupported assertions, the Court simply cannot hold that the contractual documents "included that requirement." *Id.*

Next, the government mistakenly equates the fact that BES "recognized that the project scope of work included part of the basement," with the theory that the contract required the demolition and replacement of usable bathroom fixtures and pipes. *Id.* at 25. The government points to BES's design narrative from the Schematic submission, which states that "[d]emolition work will completely demolish existing plumbing service piping lines no longer in service or service pipe that has become deteriorated with age"; however, this argument gets the government nowhere closer to its end, as BES contends that the plumbing lines in the basement bathrooms were still in service and had not become deteriorated with age. *Id.* (quoting, only in part, ECF No. 36-13 at 36). The government claims that the requirement was clear because in a meeting between BES and the VA on August 9, 2016, they discussed the project's plumbing requirements. *Id.* Yet, the August 9 meeting minutes are made up of 143 bullet points, not one of which mentions basement plumbing and only four of which address plumbing on other floors. *Id.* (citing ECF No. 36-15).

The government makes a second, related argument that necessitates logical leaps to arrive at its desired conclusion: BES was contractually required to design plans to demolish the basement plumbing and fixtures because it was "required to get rid of any 'dead ends' or other fixtures that were no longer being used." *Id.* The government cites to the plumbing design guidelines contain in PG-18-10, specifically to 4.4.1 and 4.4.2, which define "dead ends" as "uncirculated or unused pipe with one end open to the system and the other end terminating at a cap, blind flange, seldom used outlet, or closed valve," as well as lay out requirements for dead ends, including that "[d]ead end mitigation is for renovation work." ECF No. 36-65 at 37; ECF No. 36 at 25. In other words, according to the government, because the plumbing for the basement bathroom already existed, it had to be replaced because dead ends were not permitted under the guidelines.

This argument, however, fares no better than the government's previous argument. First, the existence of dead ends is entirely inapposite with respect to the demolition of basement bathroom plumbing and fixtures. Not only does the dead end requirement not even apply to functional fixtures, but the basement plumbing was, by BES's very designs, going to be reused, so it was not "unused pipe" that would have even called for dead ends. ECF No. 36-65 at 37. Even if the Court were to accept this strained reading of how to define dead ends, the government further stretches this provision by asking the Court to read the word "mitigation" to mean "get rid of" all dead ends. *See* ECF No. 43 at 26:24–25. The government has no support for this interpretation of the guideline or for a requirement that dead ends be entirely removed. In fact, the rest of 4.4.2 indicates that dead ends are permitted, so long as they follow the applicable sizing parameters. ECF No. 36-65 at 37. Put differently, the argument that VA guidelines found in PG-18-10 mandate that the basement plumbing be removed rather than reused is itself a dead end.

The government also places a burden on BES to show "why [the basement bathroom fixtures and plumbing] would not require demolition" and explain "why it believed particular

piping could be re-used." ECF No. 40 at 6–7. It argues that this "goes to the issue of prejudice and whether the government was prejudiced based on when BES gave their notice." ECF No. 43 at 30:17–19. The government relies on *K-Con Bldg. Sys., Inc. v. United States* to support this argument. 778 F.3d 1000 (Fed. Cir. 2015). There, a contractor's case was dismissed for lack of jurisdiction because the contractor waited more than two years after a change was ordered to "identify the 'date, circumstances, and source of the order[s]' [and] object[] to and indicate that it 'regard[ed] the order[s] as change order[s]." *Id.* at 1009–10 (first, fourth, fifth, and sixth alterations in original) (quoting 48 C.F.R. § 52.243-4(b)). With respect to the timeliness of notice, the first time that the VA ever raised the issue of replacing the basement plumbing and fixtures, according to the documents before the Court, was in January 2019. ECF No. 36-43 at 3 (commenting on basement plumbing drawings that "piping, valves and clean outs need replacement"). BES replied within a matter of days: "[e]xisting budget will not permit replacing existing piping. Extensive Demolition of finishes will be required. Existing recirculating lines are reused." *Id.* The issue was reraised by the COR in September 2019, and BES again promptly replied "the demolition and replacement of functional fixtures and plumbing" was "not in our original scope of work and will require a change order to add them to the contract documents." ECF No. 36-50 at 2. By the time BES filed its certified claim in February 2020, it seems to have explained its reasoning for reusing the fixtures and pipes each time the VA brought up the issue. BES did precisely what *K-Con* asks contractors to do: it gave "timely notice of what amounts it might be on the hook for, so that it would not be surprised by money claims later, as well as an opportunity to address demands for more money when it might yet avoid them." 778 F.3d at 1010. There can be no doubt that the Court has jurisdiction over the claim for changes to the basement bathroom plumbing and fixtures under *K-Con*.

There remains a genuine dispute of material fact as to whether the basement plumbing fixtures and pipes were contractually required to be demolished and replaced or whether they could have been reused.

> **b.    The government failed to show that the contracts required BES's designs to replace all electrical panels within the building.**

Again, in the first three of its four substantive submissions, BES designed its electrical plans to reuse existing electrical panels that were already in the building and still functional. *See* ECF No. 36-14; ECF No. 36-18; ECF No. 36-24. In an affidavit offered in opposition to summary judgment, the CEO and President of BES explained: "[t]his design change added a significant number of electrical panels (23 panels) [and required them to] locate and construct the multitude of new circuits and wiring[,] . . . [which] added cost and time . . . [and which] was unnecessary, as the existing panels were in functioning condition and had not outlived their useful lives." ECF No. 39-1 ¶ 14. As with the basement plumbing, the ECC confirms a dramatic increase in the Final Document submission that incorporated the requested changes. *Compare* ECF No. 36-13 at 42 (estimating an ECC of $3,703,748.00), *with* ECF No. 36-59 at 41 (estimating an ECC of $6,610,995.00). To BES, the removal and replacement of these electrical panels made little sense based on the ECC, the scope of work, the general parameters of the design, and the contractual language did not seem to require that usable panels be replaced. *See* ECF No. 39 at 10.

The government interprets the contractual language as requiring that *all* electrical panels be replaced. First, the government directs the Court to the list of categories of drawings and designs that BES was responsible for in Supplement B; however, the broad category of "electrical" designs does not address whether all or only some electrical panels were contractually required to be replaced. ECF No. 36 at 24–25. The government next points the Court to an electrical construction guideline found in PG-18-15 as support for its argument. ECF No. 36 at 25; ECF No. 40 at 5. That provision mandates that a contractor must, at minimum, identify the "[l]ocation and size of: [e]lectrical equipment, electrical closets, telephone closets, signal closets, electrical distribution equipment." ECF No 36-6 at 32. Yet, this citation provides no actual support for the government's interpretation. The government does not show that electrical panels are even included in the list—that electrical equipment or electrical closets encompass electrical panels. Moreover, there is no disagreement over the idea that for areas of the building within the scope of work, BES was required to identify the electrical panels.[3] The issue here though is not the *identification* of electrical panels but the *replacement* of electrical panels.

The government also refers to two notes in Supplement B to attempt to show that all electrical panels within the targeted area of renovation had to be replaced. ECF No. 40 at 5. The government first refers to language in Supplement B that states that for electrical equipment, the contractor must "[i]nclude means and clearances for installation, maintenance, and removal/replacement of equipment." ECF No. 36-3 at 16. The government next refers to Supplement B language that states that electrical designs should "[i]nclude basic assumptions, points of interconnection, impact of new construction to existing electrical distribution system, current demand loading[,] . . . and projected load of new construction" and that it should "[p]ropose various feasible electrical systems for project . . . ." *Id.* All of these requirements read together—necessitating proposals of alternative systems, showing points of interconnection, and even including means of removal or replacement of electrical equipment—simply do not amount to a showing that BES was required to submit designs for the removal of all electrical panels.

Like it did with respect to the basement plumbing, the government disputes the Court's jurisdiction over the claim for the replacement of the electrical panels because, according to the government, it did not have proper notice of the alleged change. ECF No. 36 at 26. However, like the basement plumbing, BES's certified claim not only addressed this very issue but was timely based on when the VA first raised the issue of replacing all electrical panels in the basement. In the certified claim submitted in February 2020, BES states that up until the Final Document submission, the VA "didn't require [BES] to replace any electrical panels," and that this changed only as a "result of a study that the VA did to identify panels that needed replacing" that was done "after the VA reviewed and accepted the design packages all the way through the [Design Document] milestone." ECF No. 1-1 at 8. The language of the claim suffices to put the government on notice as to BES's objections to the change. BES's claim for the replacement of electrical panels is timely.

---

[3] BES did, in fact, identify all electrical panels per an email in April 2018, in which the COR states, "I have reviewed the drawing you sent and it appears you now have identified all circuits in the panel schedule." ECF No. 36-40 at 2.

Moreover, BES seems to have raised the issue of the scope of work nearly every time the VA commented on the replacement of all electrical panels.  The first time the VA raised the issue of replacing basement electrical panels was in April 2016, when it commented on the Construction Document narrative, "Power: New panels will be provided in the renovated areas as necessary to eliminate panels past their useful life," and wrote "[s]everal Electrical FCA items were given 'D' and 'F' ratings, but corrections are not included in the [scope of work]" such as "main switchboard is old and obsolete and needs to be replaced."  ECF No. 36-25 at 8.  Although the Court does not have before it any of BES's responses to these comments, the issue was raised again in a new set of comments to the same Construction Document submission from December 2016.  ECF No. 36-26.  Therein, a litany of comments list electrical panels that the VA wanted designs for the replacement of, such as "[r]eplace both panels and end of stairwell in basement" and "[n]eed new electrical panels with new panels and feed with 100 amp line on . . . 1B (located in basement) . . . ."  *Id.* at 3.  To both comments, and to a host of others, BES responds "[n]ot in scope."  *Id.*  Again, at the Final Design phase in January 2019, the VA comments "[p]anels near stairwell 28 not identified," to which BES replies "[p]anels are not in scope"; the VA comments "[p]anels need replacement" with the same list from 2016, to which BES replies "[p]anels are not in scope."  ECF No. 36-43 at 2.  BES repeats this refrain for electrical panels ten different times throughout the document.  At each point that the VA raised the issue of replacing electrical panels, BES addressed it to the COR as "not in scope," giving the VA "reason to know that BES considered . . . its directives to be a constructive change."  ECF No. 36 at 27.

As was the case with the basement plumbing, there remains a genuine dispute of material fact as to whether the contract required that BES submit designs in which all existing, usable electrical panels were to be removed and replaced.

### c.     BES did not make a CDA claim for constructive changes to the heating system.

Unlike the two claims for constructive changes to the basement plumbing and the electrical panels, BES failed to make a CDA claim for the alleged constructive change for the replacement of steam heating with a gas-powered boiler.  As discussed above, for this Court to have jurisdiction over a cause of action brought under the CDA, such as this one, there must be a valid claim.  *James M. Ellett Constr. Co., Inc. v. United States*, 93 F.3d 1537, 1541–42 (Fed. Cir. 1996) ("Thus, for the court to have jurisdiction under the CDA, there must be both a valid claim, a term the act leaves undefined, and a contracting officer's final decision on that claim.").  BES's certified claim details BES's allegations of changes to the basement plumbing and to the electrical panels, but nowhere in the claim does BES offer "a clear unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim" with respect to changing the heating system.  *Cont. Cleaning*, 811 F.2d at 592.  The words "steam" and "heating" never appear in the claim.  ECF No. 1-1.  In fact, they do not even appear in BES's complaint.  ECF No. 1.  The first time that changes to the heating system are even discussed in the record is in an expert report, submitted by BES as a supplement to its response to the

government's motion.[4]  *See* ECF No. 392 at 3-.  Even if BES might have had a valid argument as to why the changes to the heating system were beyond the scope of work or why they caused delay, summary judgment must be awarded in favor of the government for any delay related to the change in heating systems because the heating system claim was not made in BES's claim to the contracting officer.

If BES disagreed with the government's reading of the claim or had an argument with respect to this issue of waiver, it was free to raise those at oral argument and in its brief. Unfortunately, BES failed to address the issue of waiver with respect to the change to steam heat and its absence from the certified claim on both occasions.  *See* ECF No. 39; ECF No. 43.  Even drawing all justifiable inferences in favor of BES, the Court simply cannot find enough evidence on the record to show that changes to the heating system might have, in some way, been noticed by their relation to the two other claims given that they are categorically different.  The government cannot possibly have had "timely notice" or "an opportunity to address demands for more money when it might yet avoid them" with regards to the steam heating system; therefore, the Court lacks jurisdiction to consider the issue of delays caused by changes to the heating system.  *K-Con.*, 778 F.3d at 1010.

## 2.    There Remains a Genuine Dispute of Material Fact as to Which Party Caused the Delay.

In addition to liability, a contractor must show causation—that the actions of the government and not the contractor—were the "*sole* proximate cause of the contractor's additional loss, and the contractor would not have been delayed for *any other reason* during that period."  *Triax-Pac. v. Stone*, 958 F.2d 351, 354 (Fed. Cir. 1992) (emphases in original).  It is undisputed that "every single one of BES's submissions to [the] VA were late."  ECF No. 36 at 40.  At issue is *why* BES's submissions were late.  The issue of causation is intertwined with the issue of liability.  That is to say, BES states that it was late because the government required it to complete work that was beyond the scope of the contract, ECF No. 39 at 9, whereas the government argues that BES was late because BES failed to meet the basic contractual requirements when changes were requested that were within the scope of the contracts, ECF No. 36 at 41.  Because the evidence before the Court does not foreclose the possibility that the changes were beyond the scope of the contracts, the source of delay could have been the government's changes, offering the possibility that the government was the sole and proximate cause of the 1,351-day delay that BES alleges.  Therefore, there remains a genuine dispute of material fact as to which party caused the delay.

## 3.    The Government Fails to Prove that BES's Expert Analysis Is Inadmissible.

To prove causation and damages, BES engaged an expert, John Buziak, to opine on the effects that each party's actions had on the performance of the contracts and the resultant delays. ECF No. 39-2.  For an expert's conclusions to be considered, they must meet the standard set

---

[4] Given that BES's expert's conclusion relies on the change from steam heat to reach his conclusions, BES may move the court to reopen discovery so that it might develop the record of resultant delays and damages without this element of the analysis, assuming it cannot be easily separated from expert report that was exchanged with the government.

forth in Federal Rules of Evidence ("FRE") Rule 702, including that "testimony is based on sufficient facts or data," that "the testimony is the product of reliable principles and methods," and that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." FED. R. EVID. 702(b)–(c). The government contends that Mr. Buziak's report is inadmissible because he used an unreliable methodology to reach his conclusions, he failed to consider relevant facts in coming to his conclusions, and he did not reliably apply the principles and methods to the facts to come to valid conclusions. ECF No. 36 at 34, 44, 38. An analysis of Mr. Buziak's expert report and excerpts from his deposition transcript—at least at this juncture—does not demonstrate that Mr. Buziak's expert testimony is unreliable under FRE 702.

###### a. **Methodology**

Mr. Buziak's methodology is at issue because the government alleges that he employed the "much-maligned" As Planned/As Built (AP/AB) method of analysis for attributing delay and damages and not the "preferred" Critical Path method. *Id.* at 32. The government's contention is that Mr. Buziak used an AP/AB method of which courts have been skeptical due to its unreliability. *Id.* at 36. The government asserts that the AP/AB "methodology is not the same as the [Critical Path method], nor does it fall under the umbrella of critical path analysis." *Id.* at 34. To support this argument, the government cites excerpts from a transcript in which Mr. Buziak is questioned about his analysis, how he performed the AP/AB analysis, and how that methodology compares to something called a Windows method. ECF No. 36 at 34 (citing ECF No. 36-67 at 6; ECF No. 36-68 at 5). Nowhere in those excerpts does Mr. Buziak state or even imply that the AP/AB method "does not fall under the umbrella of a critical path analysis." *Id.* Indeed, in his expert report, Mr. Buziak states that he used the project schedule "to create a Critical Path Method schedule" to complete his analysis. ECF No. 39-2 at 2. To support its argument that the AP/AB method and Critical Path method cannot be used together, the government cites to the Forensic Schedule Analysis ("FSA"), a publication of the Association for the Advancement of Cost Engineering ("AACE") that Mr. Buziak cites in his own report. In its brief, the government selectively quotes from the FSA manual; it writes that the manual "discusses the use of [the AP/AB] methodology, stating that 'the method does not involve any *explicit* use of [Critical Path method] logic and *can* be simply an observational study of start and finish dates of various activities.' Ex. 69 at 47." ECF No. 36 at 42. However, in its brief the government omits an operative phrase at the beginning of the sentence that alters the sentence's meaning. The quotation in full begins "*In its simplest application,* the method does not involve any *explicit* use of CPM logic . . . ." ECF No. 36-69 at 40 (first emphasis added, second emphasis in original). The government fails to show that Mr. Buziak performed an AP/AB analysis "in its simplest form," which would rule out the possibility that he did include elements of a Critical Path analysis. In other words, the government has put forth no evidence that Mr. Buziak did not perform any parts of a critical path analysis in coming to his conclusions.

Had the government shown that Mr. Buziak performed an AP/AB analysis "in its simplest application," the government would still have to prove that his use of the AP/AB method renders his analysis inadmissible. In its brief and at oral argument, the government essentially asks the Court to hold that the AP/AB method is, as a matter of law, an impermissible methodology for use in attributing causation and damages. To support its argument, it turns to *Morganti National, Inc. v. United States*, 49 Fed. Cl. 110 (2001). ECF No. 36 at 36. In

*Morganti*, Judge Firestone gave virtually no weight to an expert's AP/AB analysis since "his analysis [was] in essence a 'total time' approach, which is virtually of no value." 49 Fed. Cl. at 134. Leaning on *Morganti*, the government urges the Court to dispense of Mr. Buziak's report on the basis that the AP/AB analysis "is virtually of no value," but that is not *Morganti*'s holding. ECF No. 36 at 36. *Morganti* states that the "total time" approach "is virtually of no value." *Morganti*, 49 Fed. Cl. at 134. It does not say that the AP/AB method always amounts to a "total time" approach. What is more, the AP/AB method is not entirely without its merits. For instance, in *Slone Assocs., Inc. v. United States*, Judge Kaplan relied on an expert's use of an AP/AB method given that "a 'very unique set of circumstances' is required for the as-planned versus as-built methodology to be 'meaningful,'" such as "'minimal logic changes' in the work sequence" or that the "project was so 'simple, repetitive, [and] linear." 166 Fed. Cl. 771, 809 (2023) (alterations in original) (quoting the expert's testimony from the trial transcript).

Although the rejection of the AP/AB analysis in *Morganti* may have been, in part, based on its shortcomings as a methodology, that rejection is not dispositive of whether the AP/AB method can ever be considered reliable. FRE 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny offer courts factors to consider in determining whether a methodology is reliable. However, the list of considerations in FRE 702 and other court-established tests for determining reliability are not definitive. *See Trin-Co Invest. Co. v. United States*, 130 Fed. Cl. 592 (2017). Instead, the inquiry is a flexible one, in which these factors can be used "where they are reasonable measures of reliability of expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Here, strict adherence to the language of FRE 702 in, say, requiring that AP/AB methods have a known error rate or to have been published in peer-reviewed journals seems inapposite based on the type of analysis involved in Mr. Buziak's calculations. Based on the Court's review of Mr. Buziak's approach in his expert report and the deposition transcript excerpts it has been provided, the government has not shown that that Mr. Buziak's analysis does not meet the standard of reliability set forth in FRE 702.

Indeed, the FSA guidelines support the idea that a simple, linear project of shorter duration is an ideal candidate for the AP/AB method. ECF No. 36-69 at 42. The government finds it inapt here because AP/AB "should not be used 'where there are significant changes between the original planned work scope and the final as-built scope.' [Ex. 69] at 49." ECF No. 36 at 35. But once again, operative language from the FSA is notably absent from the government's brief. In full, the sentence reads "*[t]he minimum implementation of this method* is applicable only to relatively simple cases and should not be used for long duration cases or where there are significant changes between the original planned work scope and the final as-built scope." ECF No. 36-69 at 42 (emphasis added). There is no clear argument made as to why the project at issue here is not a "simple case" that allows for the use of Mr. Buziak's AP/AB analysis.

Even if a critical path analysis would have offered other virtues that the AP/AB method leaves wanting, the government's burden was to show that the AP/AB method was, as a matter of law, inadmissible due to its flawed methodology. The government has not shown that Mr. Buziak did not perform any aspects of a critical path analysis, and it has also failed to show that

the AP/AB method is impermissible here.  As such, whether Mr. Buziak's methodology was the ideal one remains an issue of weight and not admissibility.[5]

### b.    Underlying data

In coming to his conclusions, Mr. Buziak reviewed similar documents as those the Court has before it—contracts, meeting minutes, comments, submissions, as well as TIL provisions and guidelines.  ECF No. 39-2.  In order to reach his conclusions, it seems that Mr. Buziak used these documents "to create a Critical Path Method schedule as described in the FSA."  ECF No. 39-2 at 2.  The government faults this approach, stating that because "BES never created a schedule prior to contract performance, nor did it maintain one during performance," Mr. Buziak's approach amounts to a "hypothetical, after-the-fact projection."  ECF No. 36 at 37 (quoting *Interstate Gen. Gov't Contractors, Inc. v. West*, 12 F.3d 1053, 1060 (Fed. Cir. 1993)).  This conclusion simply does not follow.  Mr. Buziak posits that "as is often the case with the design phase of construction projects, no formal schedule was prepared."  ECF No. 39-2 at 2.  Moreover, Mr. Buziak did not simply make up a schedule, but rather he used the very claim at issue in this case to determine what the originally planned project schedule was and built on that foundation.  *Id.* at 2, 6–7.

The government also faults Mr. Buziak's analysis for not reviewing "any evidence of the work BES performed on a daily basis or the hours that BES worked on the project" as well as for "only spending approximately 12 hours total reviewing the documents and three hours writing his report."  ECF No. 36 at 37, 38.  The government has made no showing that under FRE 702 or relevant caselaw, Mr. Buziak was required to review evidence of BES's daily working patterns (beyond "the emails and . . . correspondence" he reviewed that evinced BES's progress throughout the three years in question), was required to review time sheets, or was required to spend more than fifteen hours in reviewing documents and writing his report.  The standard does not mandate that an expert rely on all possible facts and data but rather sufficient facts and data.  Beyond that, issues of what information Mr. Buziak could have used beyond the sufficient facts and data required go to the weight of the evidence and not its admissibility.

### c.    Application of methods to underlying facts

Based on the record before the Court, Mr. Buziak does not appear to have improperly applied his methodology.  The government claims that Mr. Buziak could not have properly applied his methodology because he "[i]mproperly [f]ound VA [t]o [b]e 100 [p]ercent [a]t [f]ault."  ECF No. 36 at 38.  In a footnote, the government promptly retracts this assertion, admitting that "Mr. Buziak's report attributes 11 days of delay to BES during the completion of the [Schematic submission]."  *Id.* at 39, n.6.  The government disregards those eleven days because Mr. Buziak's report does "not explain how those 11 days are accounted for or whether they offset some of the claimed VA delay."  *Id.*  For the Schematic submission, Mr. Buziak's

---

[5] If, as this case proceeds to trial, the government chooses to file a motion in limine to exclude Mr. Buziak's conclusions on the basis of flawed methodology, it will need to offer more regarding whether Mr. Buziak definitively did not conduct any aspects of a critical path analysis, and also whether the AP/AB methodology is impermissible or conversely whether the critical path analysis is the only appropriate methodology that could have been used in this case.

attributes twenty-nine days of delay to the government and eleven days of delay to BES. ECF No. 39-2 at 4. When asked how he came to that conclusion in his deposition, he describes how he generally calculates delay days using a "total impact analysis," whereby he looks at the "displacement at the end of the schedule, [not just] . . . the internals," and without which "you miss a lot of concurrency." ECF No. 36-68 at 8. However, for this eleven-day delay, he was able to attribute the delay to BES's work on the Schematic submission in isolation. *Id.* ("Q: . . . So the 11 days are due to the change in scope at the [Schematic Submission] in isolation, right? A: Yes."). Based on his responses, Mr. Buziak did what the government asked, explaining that the eleven days originated in BES's delay on the Schematic submission and that they were not offset by the VA's delays that were calculated through the total impact analysis. Mr. Buziak neither found the VA to be 100 percent at fault in the attribution of delay nor did he improperly apply his methodology to the given facts in concluding that eleven days of delay are attributable to BES.

### 4. BES's Delay Damages Remain in Dispute.

Finally, the Court turns to the third element of equitable adjustment: resultant injury. For a contractor to recover under a theory of equitable adjustment in a CDA claim, the contractor must prove that there was, in fact, an increase in cost. *See Propellex Corp. v. Brownlee*, 342 F.3d 1335 (Fed. Cir. 2003) (affirming the decision of the Armed Services Board of Contract Appeals to deny contractor's claim for additional compensation because the contractor could not prove its actual losses directly). Equitable adjustment, more fundamentally, recognizes that a non-breaching party may have had to render services at a higher cost than for which it originally contracted. *See Hi-Shear Tech. Corp. v. United States*, 356 F.3d 1372, 1380 (Fed. Cir. 2004) ("Thus, the 'equitable adjustment compensates for changes by paying a contractor its increased costs resulting from the change, plus an allowance for profit on that cost.'" (quoting *Rumsfeld v. Applied Cos.*, 325 F.3d 1328, 1341 (Fed. Cir. 2003)). The goal is to "place the contractor in the position it would have occupied but for the government's breach." *Id.* To determine what adjustment is appropriate, the Federal Circuit has stated that its "preferred way for a contractor to prove increased costs is to submit actual cost data because such data 'provides the court, or contracting officer, with documents underlying expenses, ensuring that the final amount of the equitable adjustment will be that—equitable—and not a windfall for either the government or the contractor.'" *Propellex*, 342 F.3d at 1338–39 (quoting *Dawco Constr., Inc. v. United States*, 930 F.2d 872, 882 (Fed. Cir. 1991)). In some cases, other methods of calculation for the adjustment may be used, especially when actual cost data is unavailable; the use of actual cost data is merely the preferred way. *Id*. at 1338;[6] *see, e.g., Servidone Constr. Corp. v. United States*, 931 F.2d 860 (Fed. Cir. 1991) (holding that a modified total cost method was appropriate given that it was the only effective way to calculate the difference between reasonable anticipated and actual costs); *Tecom, Inc. v. United States*, 66 Fed. Cl. 736 (2005) (holding that the total cost method, which

---

[6] The government misreads *Propellex* to stand for the proposition that a contractor "*must* 'submit actual cost data.'" ECF No. 36 at 30. The government reaches this misreading by eliminating operative words at the beginning of the relevant sentence in the *Propellex* decision: "*the preferred way* for a contractor to prove increased costs is to submit actual cost data . . . ." *Propellex*, 342 F.3d at 1338 (emphases added). This is yet another instance in the government's briefing of it omitting operative language in its quoted sources, altering the source's meaning and the bearing it has on the government's argument. The government should refrain from this type of selective quotation in the future.

subtracts the contractor's bid from the total costs incurred, was an acceptable substitute for actual costs).

In February 2020, BES submitted a certified claim in the amount of $198,486.63. ECF No. 1-2 at 4. BES detailed the calculations it used to reach the conclusion. First, it attributes a "1,351 calendar day delay [to] the VA as a result of scope changes and multiple rejects of the design documents by the VA." *Id.* From there, it reaches the $198,486.63 figure by calculating the price per day of overhead ($99.45), postage and reproduction costs, travel, and additional submittals for each of three submissions. *Id.* It also adds labor costs for the redesign and the final payment application that was rejected by the VA. In its complaint, BES asks for relief in the form of damages that total $198,486.63 with interest and attorneys' fees. ECF No. 1 at 9.

The government argues that BES is not entitled to damages because the alleged damages are untethered to any actual costs. ECF No. 36 at 29–30. In its argument, the government cites to BES's certified claim, in which BES lists each cost it claims to have incurred because of government-caused delay. *Id.* at 30 (citing ECF No. 1-2 at 4). At no point does the government show that this list is not a list of BES's actual costs. It fails to show that, for example, BES did not actually spend $2,500.00 on postage and reproduction or that its daily overhead was not, in fact, $99.45 for the 1,351 days in question. *Propellex* does not mandate that costs be listed in a certain way, such as being categorized, itemized with the hours of labor spent, or organized by when the costs were incurred. 342 F.3d 1335; *see also* ECF No. 36 at 30. The list need not be so exacting, as its role is simply to ensure that the adjustment is equitable and not a windfall. *See Propellex*, 342 F.3d at 1339. As such, it remains a question of fact whether BES alleged damages that are substantiated by its listed costs. Likewise, it remains to be seen whether BES's listed costs are its actual costs.

The government finally argues that BES is not entitled to damages because the stated damages do not relate to any of the changes that it alleges the government made. ECF No. 36 at 29–30, 43. Yet, BES puts forth Mr. Buziak's expert report as a means of connecting each alleged change with the delay and subsequent cost incurred. *See* ECF No. 39-2 at 4–6. For example, in his report, as discussed above, Mr. Buziak attributed eleven days of delay to BES and twenty-nine days to the government for changes made to the Schematic submission. *Id.* at 4. Beyond the government's previously discussed grievances with Mr. Buziak's report, it is simply untrue that BES "does not detail what those costs comprise." ECF No. 36 at 30.

With respect to BES's damages, the third element of a claim for equitable adjustment, it remains to be seen whether BES's listed damages are actual and whether BES's damages relate to the alleged changes as there is a genuine dispute as to material facts.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the government's motion for summary judgment. The Court lacks subject matter jurisdiction over any claims that relate to changes to the building's heating system. All other aspects of the motion are denied. The parties shall file a joint status report on or before **March 25, 2025,**

proposing a schedule for pre-trial proceedings in accordance with RCFC Appendix A along with proposed dates for trial.

**IT IS SO ORDERED**.

s/ Zachary N. Somers
Zachary N. Somers
Judge